# IN THE COURT OF APPEALS OF TENNESSEE, AT JACKSON

FILED

February 2, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

|  |  |  |
|---|---|---|
| **TODD FREDERICK BROOKS**, | ) | Shelby County Circuit Court |
|  | ) | No. 152550-3 R.D. |
| Plaintiff/Appellant/Cross-Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9709-CV-00225 |
|  | ) |  |
| **LINDA FAYE CARTER**, | ) |  |
|  | ) |  |
| Defendant/Appellee/Cross-Appellant. | ) |  |
|  | ) |  |

From the Circuit Court of Shelby County at Memphis.
**Honorable Karen R. Williams, Judge**

**Robert L. J. Spence, Jr.**, Memphis, Tennessee
**Karen R. Cicala**, Memphis, Tennessee
**Sara D. Flowers-Dent**, Memphis, Tennessee
Attorney for Plaintiff/Appellant/Cross-Appellee.


**Rita L. Stotts**,
**Viola E. Johnson**,
STOTTS, HIGGINS, JOHNSON, Memphis, Tennessee
Attorney for Defendant/Appellee/Cross-Appellant.

OPINION FILED:

**REVERSED IN PART, MODIFIED IN PART, AFFIRMED IN PART AND REMANDED**

**FARMER, J.**

**HIGHERS, J.**: (Concurs)
**HAYES, Sp. J.**: (Concurs)

Defendant Todd Frederick Brooks (Father) appeals, and Plaintiff Linda Faye

Carter (Mother) cross-appeals, the final divorce decree entered by the trial court which awarded the parties joint custody of their three minor children, designated the Father as the primary custodial parent, ordered the Father to pay child support to the Mother, and distributed the parties' property. We affirm the trial court's distribution of the marital property, with one modification, but we reverse the court's custody decision and we remand for the court to recalculate the Father's child support obligation pursuant to the Child Support Guidelines.

## I. Procedural History

These divorce proceedings began in June 1996 when the Father filed a complaint for divorce against the Mother alleging abandonment and inappropriate marital conduct. The Mother counterclaimed for divorce on the grounds of inappropriate marital conduct and irreconcilable differences. Both parties sought custody of their three minor children, a daughter born in August 1989 and two sons born, respectively, in February 1992 and September 1995. In July 1996, the trial court entered an order appointing a guardian *ad litem* to represent the interests of the three children in these proceedings.

By virtue of a consent order entered by the trial court in August 1996, both parties continued to live in the marital home pending further orders of the court. After conducting a hearing over nine separate days, beginning September 17, 1996, and ending October 30, 1996, the trial court entered an order which, *inter alia*, awarded the parties joint custody of their three children pending these proceedings. The order on temporary custody designated the Father as the primary custodial parent and provided that the Father and the minor children would continue to live in the marital home. The order granted the Mother visitation on Monday through Thursday of each week, beginning at 3:15 p.m. when the two older children finished school for the day and ending by 8:30 p.m. The order also granted the Mother visitation every other weekend from 8:00 a.m. on Saturday until 10:00 a.m. on Sunday. For the remaining weekends, the Mother was granted visitation on Sunday from 10:00 a.m. to 9:00 p.m.

In February 1997, the trial court entered an order, upon the Mother's motion, relieving the guardian *ad litem* of her duties in this case and appointing a Court Appointed Special

Advocate (CASA) to represent the interests of the children. The trial court's order directed CASA to conduct an investigation and submit a written report relative to specific issues identified in the court's order. Despite its directive, the trial court subsequently refused to admit the CASA report into evidence at the final divorce trial. The trial court indicated that it would rely upon the CASA worker's oral testimony rather than her written report.

After conducting the final divorce trial in July 1997, the trial court entered a final divorce decree which awarded both parties an absolute divorce, awarded the parties joint custody of their three minor children, designated the Father as the primary custodial parent of the children, awarded specified visitation to the Mother, and distributed the parties' property. In contrast to the temporary custody order, the final decree awarded the Mother visitation with the minor children every Thursday until 8:00 p.m., every other weekend from Friday afternoon to Monday morning, two weeks in August, and specified holidays. Although the Father was designated as the primary custodial parent, the trial court ordered him to pay child support to the Mother in the amount of $1800 per month "to help provide the [Mother] with living quarters large enough to accommodate for the children's weekend visits." The court ordered the Father to maintain medical, dental, and mental health insurance on all three children. With regard to the distribution of the parties' property, the trial court ordered that the proceeds of the Father's interest in the River City Medical Group and the parties' equity in the marital residence be split evenly between the parties upon the sale of these assets. The trial court also distributed the parties' various investment accounts in accordance with the Father's proposed distribution of these accounts.

On appeal from the final divorce decree, the Father contends that the trial court erred (1) by ordering the primary custodial parent, the Father, to pay child support to the non-custodial parent, the Mother, and, conversely, by failing to order the Mother to pay child support to the Father, (2) by ordering the Father to provide health insurance coverage for the parties' children, (3) by awarding the Mother one-half of the Father's share of the proceeds of the medical practice in which he owned a partial interest upon the sale of this asset, and (4) by finding that the Father's debt to the Internal Revenue Service was not a marital debt.

The Mother also has appealed, contending that the trial court erred (A) by designating

the Father as the primary custodial parent of the parties' three minor children, (B) by limiting the admissibility of the CASA report and ignoring the CASA worker's testimony, and (C) by failing to make an equitable distribution of the parties' marital property, specifically their investment accounts.

## II. Child Custody

Prior to reviewing the trial court's custody decision, we feel compelled to point out that our review of the appellate record in this case was hampered significantly by the parties' failure to comply with rule 14 of the rules of this court regarding the abridgement of records. The record in this case consisted of twenty volumes and over 1100 pages of testimony. Pursuant to rule 14, therefore, this court ordered counsel for the parties to submit an abridged transcript. *See* Tenn. Ct. App. R. 14 (providing that this court may order counsel to abridge record in all cases where transcript of evidence, including depositions, exceeds 300 pages). Rule 14 requires counsel for the appellant to include in the abridged record all of the testimony "deemed sufficient to convey a fair, accurate and complete account of what transpired with respect to those issues that are the basis of appeal." Tenn. Ct. App. R. 14. If the appellee's counsel deems the abridged record to be insufficient, he or she, in turn, has the responsibility of designating such other parts of the transcript to be included in the abridged record as will aid this court's review of the issues before it. *Cohen v. Cohen*, 1990 WL 75079, at *1 (Tenn. App. June 8, 1990), *perm. app. denied* (Tenn. Sept. 24, 1990); Tenn. Ct. App. R. 14.

In our view, the parties have failed to include within the abridged record all of the testimony necessary to convey a "fair, accurate and complete" account of what transpired below relative to the issues now raised by them on appeal. Tenn. Ct. App. R. 14. This failure is particularly troublesome as it pertains to the child custody issue raised by the Mother on cross-appeal. An appellant who fails to include the relevant portions of the testimony in the abridged record takes the risk that this court will decline to review the issues raised by the appellant because, in the absence of the necessary portions of the transcript, this court generally must presume that the findings of the trial court were supported by the evidence heard below. *Nguyen v. Hart*, No. 03A01-9302-CH-00058, 1993 WL 291411, at *4 (Tenn. App. July 29, 1993), *perm. app. denied* (Tenn. Nov. 29, 1993).

Nevertheless, we are mindful that the central issue in this case is the custody of the parties' three minor children, and that the resolution of this issue turns on what is in the best interest of the children, and not the best interest of the parties themselves. In order to make this determination, therefore, we found it necessary to review the entire original transcript submitted with the appellate record instead of merely relying upon the abridged record provided by the parties.[1]

Our review of the trial court's custody decision is governed by Tennessee Rule of Appellate Procedure 13(d). *Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. App. 1996); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. App. 1993); T.R.A.P. 13(d). This standard requires us, in conducting a *de novo* review of the record, to presume that the trial court's findings of fact are correct, unless the evidence in the record preponderates otherwise. *See* T.R.A.P. 13(d). In applying this standard of review, we recognize that "[t]rial courts are vested with wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch*, 874 S.W.2d at 575. Our paramount concern, and that of the trial court, is the welfare and best interest of the parties' minor children. *Ruyle*, 928 S.W.2d at 441; *Koch*, 874 S.W.2d at 575. This determination necessarily turns on the particular facts of each case. *Koch*, 874 S.W.2d at 575.

In the present case, the evidence revealed the following facts, most of which were undisputed. The Father worked as an obstetrician-gynecologist and was affiliated with Methodist Central Hospital in Memphis. The Father also served as a clinical instructor at the University of Tennessee-Memphis. The Father participated in a nineteen-physician call group. On weekdays, the Father generally left the house at 7:00 a.m. and did not return until about 6:00 or 6:30 p.m. The Father's job required him to be on call for his own patients from 7:00 a.m. to 5:00 p.m. during the work week. In addition, two or three times per month, the Father was required to be on call to treat the patients of the other physicians in his group. On these occasions, another adult besides the Father was required to stay with the children in the marital home because, at any moment, the Father

---

[1]In making its custody determination, the trial court indicated that it relied on the evidence presented both at the October 1996 temporary custody hearing and at the July 1997 final divorce trial. On appeal, the parties likewise relied on the testimony and evidence adduced at both hearings. In reviewing the trial court's custody decision, therefore, this court reviewed the transcripts of both hearings.

could be called to the hospital to deliver a baby.

In contrast, the Mother had a more flexible work schedule which enabled her to spend a greater portion of her time with the children. The Mother, who had an MBA degree from the University of Memphis, worked part-time in the personnel department at Federal Express. She worked three days per week, Tuesday, Wednesday, and Friday. The Mother was able to arrange her work schedule so that she could pick up the children from school every afternoon at 3:15 p.m. The Mother also transported the children to extracurricular activities in the afternoon, such as piano, gymnastics, and martial arts lessons, and she provided the children with their evening meal. During the marriage, the parties hired a nanny to watch their youngest child during the work week. During most weeks, the Mother cared for the youngest child on Monday, and the nanny cared for him from Tuesday through Friday. The Mother also cared for the youngest child on Saturday while the Father spent time with the two older children.

At the temporary custody hearing and, later, at the final divorce trial, both parties claimed to be the children's primary caregiver. The Mother testified that she breast-fed all three children and stayed home with them during the first six months of their lives. According to the Mother, she also helped the children prepare for school in the morning and made sure that they were properly dressed and groomed. On the other hand, the Father testified that he awakened the children, fed them breakfast, helped them dress, and transported them to school each weekday morning. The Father also testified that, the majority of the time, he was the parent who bathed the children and put them to bed at night.

Despite the Father's claims to be the children's primary caregiver, the overwhelming weight of the testimony supported the conclusion that the Mother consistently fulfilled this role throughout the parties' marriage. In his own testimony, for example, the Father acknowledged that the Mother was the parent primarily responsible for ensuring that the children's health-care needs were met. As a general rule, the Mother transported the children to the pediatrician's office, used the children's insurance prescription card to get their prescriptions filled, administered the children's medications, and cared for the children when they became ill. Most of the time, the Mother was the parent who stayed home from work when the children were ill. The Mother also was the parent who

took the children to the dentist's office for checkups every six months.

The parties' youngest child was born with a large birthmark on the side of his face, which was described by the parties and doctors as a giant pigmented nevus. The child had undergone several surgeries to correct this condition, and at least two more surgeries would be required in the future. The Mother's testimony was uncontradicted that she was the parent who largely was responsible for the child's care after each surgery. The Mother explained that this care required that a piece of silicone be placed on the child's face and secured by a protective cap. The Mother expressed concern over the child's care while he was in the Father's custody because, on several occasions when she picked up the child for scheduled visitation, either he was not wearing the protective cap or the nanny had not placed the silicone on his face correctly.

In addition to ensuring that the children's medical needs were met, the Mother also played a more active role than did the Father in ensuring that their educational needs were met. The Father acknowledged that the Mother had more contact with the children's teachers than he did, a fact which was confirmed by one of the children's teachers. The Mother served as a room mother at school and attended almost all of the children's school parties. According to the same teacher, the Mother inquired as to the child's progress on a regular basis, whereas the Father never had consulted the teacher on this matter. In fact, the teacher did not remember ever having spoken to the Father. The Father further acknowledged that the Mother set up a special room in the parties' home where she presented additional educational materials to the children and that the Mother had taught sign language to the parties' oldest child.

In addition to the foregoing responsibilities, the Father acknowledged that the Mother had assumed most of the responsibility for arranging and scheduling the children's extracurricular activities, as well as transporting them to these activities. The Mother enrolled the children in such activities as piano lessons, gymnastics, and martial arts lessons. The Mother's work schedule enabled her to transport the children to these various activities on Mondays, Wednesdays, and Thursdays after school.

Prior to entry of the temporary custody order, the Mother also assumed the

responsibility of paying the nanny and giving her instructions concerning the daily care of the children. The Mother primarily was responsible for combing and braiding the parties' daughter's hair. The Mother maintained photo albums and diaries recording each child's development. She paid the household expenses from a joint account into which the Father deposited a portion of his earnings. After the Father filed this divorce action, but prior to the Mother vacating the marital home pursuant to the temporary custody order, the Mother slept in a bedroom downstairs near the children's bedrooms while the Father slept in a room upstairs.

After the trial court entered its temporary custody order, the already notable conflicts between the parties became increasingly hostile. Unfortunately, most of these incidents occurred when the parties were exchanging custody of the children at the marital home. The Father claimed that the conflicts were caused by the Mother because she often insisted on entering the marital home and/or refused to leave the property when asked to do so. These allegations appeared to have some merit because, in her testimony at the final divorce trial, the Mother insisted that her children's presence in the marital home somehow gave her the right to enter the home. The Father also believed that the Mother had attempted to interfere with his telephone contact with the children when they were visiting the Mother because she often provided excuses for why the children could not speak to him.

Nevertheless, the Father acknowledged that his own conduct and motives were less than exemplary. When a conflict at the marital home occurred, the Father routinely called the police in order to induce the Mother to leave the property. The Father explained that he did not want the Mother in the marital home because she kept taking marital property out of the home. The Father acknowledged, however, that one of the items which the Mother allegedly "snuck and took" was a Mercedes Benz automobile that was titled in her name.

Moreover, although in the past the Mother primarily had been responsible for providing the children's medical care, the Father admitted scheduling the youngest child's most recent surgery on a date that was "best" for the Father without regard for the Mother's schedule. After the child's surgery, the Father refused to allow the Mother to care for the child either in the marital home or in her own home. The Father was so adamant in his refusal that he enlisted the aid

of the police and hospital security to prevent the Mother from caring for the child or taking the child home with her. The Father was on call that night, so his refusal resulted in the child being cared for by the nanny instead of the Mother.

Finally, the Father admitted that he exacerbated some of the hostility between the parties by taking such actions as changing the locks on the marital home on the day before the Mother was required to move out, as well as placing a board imbedded with nails in the driveway so that the Mother's car would get a flat tire. The Father went so far as to wrap plastic around the board so that it would resemble a newspaper.

After reviewing the foregoing evidence, as well as the remaining evidence in the record,[2] we conclude that this case represents one of the rare instances where the evidence preponderates against the trial court's custody decision. In making a custody determination that was in the children's best interest, the trial court was required to consider, among other relevant factors, the following:

> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

---

[2]In addition to his more recent conduct, the Father also admitted that, prior to the parties' separation, he engaged in conduct that created cause for concern. During one fight when the Mother was pregnant with the parties' youngest child, the Mother allegedly became so enraged that she threatened to "blow away" the Father. The Father admitted that, in response to the Mother's statement, he retrieved a gun from her closet, dropped it on a chair or sofa next to her, and challenged her to shoot him. Hearing their parents fighting, the children then walked into the room, observed the gun, and became upset. According to the Mother, this altercation occurred late one evening after the Father had been drinking.

In August 1994, the Father was seriously injured in a car accident. The Father admitted that he caused the accident by falling asleep at the wheel, and he indicated that he made a "big mistake" by drinking alcoholic beverages after staying up until 4:00 a.m. the two previous nights. Although the Father claimed that he now was more careful about his drinking, and that drinking was not an important part of his life, he acknowledged that he drank beer, wine, or whiskey as often as every other day. Describing himself as a "stress smoker," the Father further acknowledged that he sometimes smoked cigarettes and drank alcoholic beverages while he was alone in his bedroom at night.

(4)     The stability of the family unit of the parents;

(5)     The mental and physical health of the parents;

(6)     The home, school and community record of the child;

(7)     The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(8)     Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(9)     The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

T.C.A. § 36-6-106 (1996).

Many of these factors favored neither parent in this case. For example, the trial court found that, although both parties had exhibited significant strengths and weaknesses in their parenting skills, both parties were fit to serve as parents of their three children. The trial court also found that both parties had demonstrated that they loved the children. On the other hand, both parties had harmed the children by exposing them to the parties' constant verbal and physical confrontations with each other, and both had engaged in "an aggressive campaign to wrest control from the other without regard to the damage this behavior inflicted on the children."

Despite the fact that both parties may have demonstrated themselves to be fit parents, we nevertheless conclude that the evidence preponderates against the trial court's award of primary custody to the Father, rather than to the Mother, in this case. The undisputed evidence revealed that the Mother had demonstrated the greater disposition to provide the children with food, clothing, medical care, education, and other necessary care and that the Mother was the children's primary caregiver during the parties' marriage. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 452-54 (Tenn. App. 1991) (affirming trial court's decision to award parties joint custody, with primary custody to father, where record revealed that father had been children's primary caregiver during latter course of parties' marriage). By the Father's own admission, the Mother was the party who took the initiative to provide for the children's health-care, educational, and recreational needs. Specifically, the Mother was the party who primarily interacted with the children's teachers and health-care providers. The Mother took the children to see their pediatrician and dentist as needed, cared for

them when they were ill, and consulted with their teachers concerning their progress in school. The Mother served as a room mother at the children's school, and she attended the children's school parties. The Mother scheduled the children's extracurricular activities and transported them to these activities during the week.

The Mother also demonstrated the greater ability and disposition to provide for the children's daily needs in the future. Whereas the Father's schedule prevents him from arriving home prior to 6:00 or 6:30 p.m. during the week, the Mother's schedule frees her to pick up the children from school at 3:15 p.m. and to spend the afternoon and evening with the children. Inasmuch as the Father is still at work during these hours, he must rely either on the Mother to spend this time with the children or on a third party, such as the nanny. By the Father's own admission, the time he has available to spend with the children during the week is significantly limited by his busy schedule. In contrast, the flexibility of the Mother's work schedule permits her to stay home with the children when they are ill and to participate in events at their school.

In fact, in his parenting plan submitted to the trial court during the final divorce trial, the Father essentially proposed maintaining the status quo of the temporary custody arrangement. Apparently, the Father planned to continue to rely on the Mother to pick up the children from school in the afternoons and to care for them until 8:30 p.m. On the two or three nights during the month when the Father was on call, he planned to offer visitation to the Mother before hiring a third party, such as the nanny or a babysitter, to stay with the children.

We agree with the trial court that both parties have demonstrated that they are fit parents who love their children a great deal; however, after reviewing the foregoing evidence, we must conclude that the trial court abused its discretion in crafting a custody arrangement which effectively denies these children the continued presence and care of the parent who has been their primary caregiver during the school week. The evidence was undisputed that the Mother's schedule enables her to spend time with the children during the weekday hours when the Father is unavailable. By his own admission, the Father has limited time to spend with the children during the school week due to his long work hours. The Father explained that the only "real day" he had was Saturday, so he spent that day with the children. However, the custody order entered by the trial court grants

primary custody to the parent whose schedule is more-suited to parenting the children on the weekends, and it deprives custody to the parent whose schedule permits her to more actively parent the children during the week. *Cf. Gray v. Gray*, 885 S.W.2d 353, 354-55 (Tenn. App. 1994) (affirming joint custody order which divided custody between parents in accordance with amount of time their respective work schedules enabled them to spend with children).

The trial court indicated that it was awarding primary custody of the children to the Father because, "of the two parents, he appeared to be more likely to allow the non-custodial parent to exercise visitation with the children." We agree that one parent's willingness to foster a continuing relationship between the child and the other parent is a valid factor for the trial court to consider in fashioning its custody decree.[3] *See Bowers v. Bowers*, 956 S.W.2d 496, 498 (Tenn. App. 1997) (affirming award of primary custody to father where evidence showed that mother continually attempted to shut father out of child's life, whereas father encouraged child to show affection to mother and attempted to maintain relationship with mother's family); *see also* T.C.A. § 36-6-106(10) (Supp. 1998) (providing that, among other factors, court shall consider willingness and ability of each parent to facilitate and encourage close and continuing relationship between child and other parent).[4]

Other than the Mother's alleged attempts to restrict the Father's telephone contact with the children, however, the record lacks sufficient evidence to support the conclusion that the Mother has attempted to prevent the Father from seeing the children. On one evening, the Mother refused to return the children to the marital home when she arrived there and discovered that only the children's nanny was present. Although the Mother's explanation for doing so was questionable, we note that the Father was on call that night and that the Mother's interference with his custody rights was minimal. We also note that the Father himself admitted that he had engaged in behavior which was designed to prevent the Mother from caring for the parties' youngest child after his most

---

[3]We also have considered the fact that the trial court's custody order enabled the children to continue to live in the marital home. Ultimately, however, this factor should be of little significance in this particular case, inasmuch as the final divorce decree provides that the marital home will be sold and the children apparently will have to move at least once regardless of which party is designated the primary custodial parent.

[4]This subsection was added by the legislature in 1998. *See* 1998 Tenn. Pub. Acts 1003.

recent surgery, despite the fact that the Mother historically assumed this role throughout the parties' marriage and despite the fact that the alternative to the Mother's care was that of a non-parent. Finally, we observe that both parties have the legal obligation to comply with court-ordered custody and visitation arrangements, and we caution the parties that judicial remedies remain available to ensure their continued compliance. *See, e.g.*, ***Brumit v. Brumit***, 948 S.W.2d 739, 740-41 (Tenn. App. 1997) (wherein, in affirming trial court's refusal to modify custody order based upon mother's alleged interference with father's visitation rights, this court noted that trial court adequately addressed mother's conduct by finding her in contempt and imposing suspended sentence of incarceration).

We recognize that appellate courts are reluctant to disturb a trial court's custody decision because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." ***Gaskill v. Gaskill***, 936 S.W.2d 626, 631 (Tenn. App. 1996). We also recognize that the trial court alone is in the position to observe the parties' demeanor and to determine their credibility. ***Brewer v. Brewer***, 869 S.W.2d 928, 934 (Tenn. App. 1993). We note, however, that despite the obvious rancor between the parties in this case, much of the evidence presented by the parties was not contradictory. Moreover, in reversing the trial court's custody decision, we have taken care to rely on the record evidence that was not disputed, such as that admitted by the Father, or, where the evidence was disputed, to accept the Father's version of events as true.

As for the Mother's complaint that the trial court erred in awarding the parties "joint" custody of their children, we acknowledge that such an arrangement might prove to be problematic in this case, given both parents' past reluctance and even outright refusal to cooperate with one another for the good of their children. Nevertheless, at the final divorce trial, both parties professed their willingness to cooperate with the other party's parenting efforts in the future, and we are reluctant to second-guess the trial court's decision to denominate this as a "joint" custody arrangement. In any event, we remain confident that, upon remand, the trial court will structure the joint custody arrangement so as to minimize the conflicts between the parties. For example, inasmuch as the Mother has been primarily responsible for making decisions regarding the children's health care, education, and extracurricular activities, we would suggest that she continue to be

responsible for these types of decisions. ***See, e.g., Schwalb v. Langlois***, No. 01A01-9304-CV-00152, 1993 WL 415766, at *2 (Tenn. App. Oct. 13, 1993) (approving joint custody order but modifying order to create definite allocation of duties and responsibilities between parent with primary custody and parent with secondary custody).[5]

In accordance with the foregoing analysis, we reverse the trial court's custody decision as set forth in the final divorce decree, and we remand for the trial court to enter an order granting the Mother primary custody of the children, awarding liberal visitation to the Father, recalculating the Father's child support obligation pursuant to the Child Support Guidelines, and setting forth the parties' respective duties and responsibilities in this joint custody arrangement. In light of our disposition of the custody issue, we need not address the Father's issues concerning child support and health insurance coverage for the children. We likewise need not address the Mother's issue concerning the trial court's evidentiary treatment of the CASA report and the CASA worker's testimony.

### III.  Distribution of Property

With regard to the trial court's distribution of the parties' property, the Mother contends that the court erred in failing to award her a greater share of the marital estate and, specifically, in failing to award her one-half of the estate's "liquid/semi-liquid" assets, such as the investment accounts accumulated by the parties during their marriage. We disagree. Trial courts have broad discretion in dividing marital estates, and their decisions are afforded great weight on appeal. ***Fisher v. Fisher***, 648 S.W.2d 244, 246 (Tenn. 1983); ***Harrington v. Harrington***, 798

---

[5]The term "joint custody" appears to have no set definition in this state. ***See DeVault v. DeVault***, No. 01A01-9601-CV-00012, 1996 WL 482968, at *4 (Tenn. App. Aug. 28, 1996); ***English v. Shouse***, No. 01A01-9108-CH-00285, 1991 WL 274517, at *4 (Tenn. App. Dec. 27, 1991); ***Oliver v. Oliver***, 1988 WL 9804, at *1 (Tenn. App. Feb. 10, 1988). This court has broadly defined joint custody to mean "shared custody and shared responsibility for support." ***Gray v. Gray***, 885 S.W.2d 353, 356 (Tenn. App. 1994). At least one trial court has more narrowly defined joint custody to mean "equal input by both parties as to decision making for the children's general welfare, health, education, and extracurricular activities." ***Martin v. Martin***, No. 03A01-9708-GS-00323, 1998 WL 135613, at *2 (Tenn. App. Mar. 26, 1998). In designing joint custody arrangements, trial courts are not confined by this latter definition. In order to avoid some of the conflicts inherent in a joint custody arrangement, trial courts may specifically delineate each party's responsibilities and duties with respect to the care of the children. ***Schwalb v. Langlois***, No. 01A01-9304-CV-00152, 1993 WL 415766, at *2 (Tenn. App. Oct. 13, 1993).

S.W.2d 244, 245 (Tenn. App. 1990). Although the trial court's distribution of the marital property must be equitable, there is no requirement that the division be equal. *Word v. Word*, 937 S.W.2d 931, 933 (Tenn. App. 1996); *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. App. 1988).

In this case, the parties' marital estate included investment accounts which totaled about $800,000. Of this amount, the Mother was awarded approximately $300,000 while the Father was awarded approximately $500,000. Although the trial court's division of the parties' investment accounts was not an equal one, we conclude that the distribution of these accounts was equitable under the circumstances of this case. While the Mother was awarded less than forty percent (40%) of the investment accounts, we note that she was awarded between forty-seven percent (47%) and forty-nine percent (49%) of the total marital estate, depending upon which parties' property valuations are used.[6] We further note that, although the Mother received fewer "liquid/semi-liquid" marital assets than did the Father, the Mother was awarded, as her separate property, over $80,000 in additional investment accounts which she acquired prior to the parties' marriage.[7] Finally, we observe that the Mother will receive additional cash assets when she receives her share of the proceeds from the sale of the marital home and from the sale of the Father's interest in the medical practice.

As for the property distribution issues raised by the Father, we first reject the argument that the trial court erred in failing to apportion the Father's IRS debt between the parties. The final divorce decree does not specifically mention the Father's IRS debt, which he estimated would exceed $200,000. By failing to mention the IRS debt in its final decree, however, the trial court effectively allocated this debt to the Father, inasmuch as the parties' filed separate tax returns during their marriage and the Father apparently is the only party legally responsible for this debt.

As with its distribution of the marital estate, the trial court was vested with broad

---

[6]These percentages take into the account the Father's IRS debt, which he estimated would exceed $200,000.

[7]In her brief, the Mother asserted that her profit sharing and stock plan accounts acquired through her current employer also constituted separate property because they were acquired prior to the parties' marriage. At trial, however, the Mother testified that she considered these accounts to be marital assets. Accordingly, we cannot fault the trial court for including these accounts within the marital estate.

discretion to allocate any debts incurred during the parties' marriage. ***Houghland v. Houghland***, 844 S.W.2d 619, 624 (Tenn. App. 1992); ***Yaffe v. Yaffe***, 1989 WL 76310, at *2 (Tenn. App. July 12, 1989), ***perm. app. denied*** (Tenn. Oct. 2, 1989). Even if, as the Father contends, the trial court erroneously characterized the Father's IRS debt as separate rather than marital property, we conclude that the trial court did not abuse its discretion in allocating this debt to the Father. We note that, even after being allocated this debt, the Father still received in excess of fifty percent (50%) of the marital estate. Moreover, we note that, at trial, the Father proposed that the IRS debt be allocated to him. In fact, with the exception of the Father's interest in the medical practice, the trial court's distribution of assets and allocation of debts was virtually identical to that proposed by the Father during the trial.

With regard to the Father's second property issue, we agree with the Father's contention that the trial court should have established the Mother's interest in the Father's medical practice as of the date of the divorce. The statute governing the distribution of marital property requires that property be valued "as of a date as near as reasonably possible to the final divorce hearing date." ***Wright v. Quillen***, 909 S.W.2d 804, 809 (Tenn. App. 1995) (quoting T.C.A. § 36-4-121(b)(1)(A) (1991)). During the final divorce trial in this case, the parties agreed that the value of the Father's interest in the medical practice was $213,684. Accordingly, we agree that the Mother's interest in the medical practice should be limited to the sum of $106,842, regardless of when the actual sale takes place. ***See Dunlap v. Dunlap***, No. 02A01-9712-CH-00320, 1998 WL 886590, at *15 (Tenn. App. Dec. 16, 1998); ***Preston v. Preston***, No. 03A01-9406-CV-00202, 1995 WL 10345, at *1 (Tenn. App. Jan. 11, 1995), ***perm. app. dismissed*** (Tenn. Mar. 27, 1995). Inasmuch as the record fails to indicate when this sale might occur, we grant the alternative relief requested by the Father on appeal that he make periodic payments to Mother. Therefore, we modify the trial court's judgment to order the Father to pay the amount of $106,842 to the Mother by making monthly payments of $1,780.70 over a period of sixty (60) months.

### *IV. Conclusion*

We reverse the trial court's custody decision as set forth in the final divorce decree, and we remand this cause for the trial court to enter an order designating the Mother as the primary custodian of the parties' three children, setting forth a liberal visitation schedule for the Father,

calculating the Father's child support obligation pursuant to the Child Support Guidelines, and specifying the parties' respective duties and responsibilities in jointly parenting their children. In addition, we modify the final divorce decree to order the Father to pay the Mother $106,842 for her interest in the Father's medical practice by making monthly payments to the Mother in the amount of $1,780.70 for a period of sixty (60) months. In all other respects, the trial court's judgment is affirmed. Costs of this appeal are taxed to the Father, for which execution may issue if necessary.

_____
FARMER, J.


_____
HIGHERS, J. (Concurs)


_____
HAYES, Sp. J. (Concurs)