**Sally Taylor Stevens BREWER, Plaintiff/Appellant,**

v.

**Clyde Norman BREWER, Jr., Defendant/Appellee.**

Court of Appeals of Tennessee, Western Section.

Aug. 11, 1993.

Application for Permission to Appeal Denied by Supreme Court Dec. 28, 1993.

Kathryn A. King, Memphis, for plaintiff, appellant.

Mimi Phillips, Memphis, for defendant, appellee.

FARMER, Judge.

This appeal is from the trial court's judgment denying Wife's petition to hold Husband in contempt of court and disallowing her to recover the alimony arrearages sought. As this jurisdiction does not recognize a right to appeal from an acquittal in a contempt case, *see Zwick v. Jones*, 589 S.W.2d 664, 666 (Tenn.App.1979), we consider the trial court's failure to order Husband to pay alimony arrearages and the denial of Husband's counter-petition which sought termination of future alimony and forgiveness of arrearages.

Sally Taylor Stevens Brewer and Clyde Norman Brewer, Jr., were divorced in March 1976. The final divorce decree awarded an absolute divorce and custody of the parties' two minor children to Ms. Brewer. The decree also acknowledged a property settlement agreement executed by the parties as "fair and reasonable."

Provisions of the decree relevant for resolution of this appeal are as follows:

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:

. . . .

3. That the property settlement agreement heretofore entered into by and between the parties be and the same is hereby approved except those portions of said agreement which relate to the counter-defendant's financial responsibilities toward the children of the parties after they reach the age of majority, said provisions being neither approved nor disapproved;

, That the major portions of said property settlement agreement are as follows:

a. That the counter-defendant will pay to the counter-plaintiff the sum of Two

Hundred Dollars ($200.00) per month as alimony, said sum to be paid in equal semi-monthly installments, said alimony to cease upon the death of the counter-defendant or the death or remarriage or [sic] counter-plaintiff;

b. That the counter-defendant shall pay to counter-plaintiff the sum of Three Hundred Dollars ($300.00) per month per child as child support, said sum to be paid in equal semi-monthly installments;

c. That the counter-defendant shall maintain the minor children of the parties on his hospitalization insurance program and to provide counter-plaintiff with suitable hospitalization if financially practical; that in any event the counter-defendant shall be responsible for counter-plaintiff's reasonable and necessary medical, dental and drug expenses;

d. That the counter-defendant shall assume, pay and be solely responsible for all reasonable medical, dental and drug bills for the minor children of the parties;

e. That the counter-defendant shall irrevocably assign one-half of the life insurance currently on his life to the counter-plaintiff as her sole property and that counter-defendant will continue to pay the premiums on a current basis; that the counter-defendant will irrevocably make the two minor children of the parties beneficiaries on the balance of the insurance currently on his life, and the counter-defendant will continue to pay the premiums thereon;

f. That in addition to the other payments set out in the property settlement agreement, the counter-defendant will pay counter-plaintiff one-half of any net income increase over his present annual income of Thirty–One Thousand Five Hundred ($31,-500.00); that net income shall be the gross income less social security and withholding taxes; that said payment will be paid to the counter-plaintiff as alimony;

g. That when the child support for each child is terminated for any reason, said payments are to be then paid to the counter-plaintiff as alimony;

Ms. Brewer filed a petition for contempt on October 25, 1991, asserting that the final decree incorporated by reference the property settlement agreement and that Mr. Brewer had failed to make the alimony payments as ordered by the court. Ms. Brewer alleged that Mr. Brewer's income had substantially increased since entry of the decree, enabling him to pay the additional alimony agreed upon. In addition to her request that Mr. Brewer be found in contempt of court, she sought an order requiring him to pay all alimony arrearages.

Mr. Brewer's response to the petition denied violation of the court's order. Brewer asserted that his income had not substantially increased since entry of the final decree and that he was not able to pay the previously agreed upon alimony. He filed a counter-petition seeking forgiveness of all alimony arrearages and termination of future alimony. Brewer alleged that the occurrence of certain events constituted a "significant change of circumstances," within the meaning of T.C.A. § 36–5–101(a)(3)(A), (B), and warranted termination or reduction of future alimony payments and forgiveness of arrearages by the court. Most significant was Ms. Brewer's alleged "on going liaison" with one Terry McDevitt. Mr. Brewer alleged that since 1980, Ms. Brewer lived and cohabited with McDevitt as husband and wife; that McDevitt resided with Ms. Brewer in her home and contributed substantially to her support through the years; and that from a financial standpoint, Ms. Brewer and McDevitt were husband and wife. Brewer asserted that he has "faithfully paid" $800 per month to Ms. Brewer pursuant to the terms of the Agreement and that Ms. Brewer never requested medical or dental payments nor presented him with debts for medical expenses.

Ms. Brewer responded by asserting that Mr. Brewer has known of her cohabitation with McDevitt since approximately 1980. She denied that McDevitt has contributed to her support or that they are husband and wife. She admitted that Mr. Brewer has paid her $800 per month pursuant to the Agreement and that she never requested medical or dental payments from him. She further asserted that her former husband was barred from relief from the court as he

had waived his rights to relief for more than 15 years.

After a hearing, the trial court denied both the petition and counter-petition. The court held:

[M]ost provisions of the Property Settlement Agreement which the Defendant is accused of violating do not appear to have been incorporated into the Divorce Decree, so as to become an Order of the Court, although those provisions were approved by the Court.

... the Court finds that there has been laches on the part of Mrs. Brewer ... and ... that there has been a waiver of the provisions the Defendant is accused of breaching.

... Mrs. Brewer did not overcome the statutory presumption created by the fact that she had a live-in companion, who occupied her bedroom, and for that reason, the obligations the Defendant is accused of violating, whether they be contractual or otherwise, have been waived.

The Court further finds that the alimony obligation of the Defendant under the Final Decree of Divorce consists of the payment of $200.00 a month to the Plaintiff. The Court further finds that the [Defendant] has met this obligation.

Appellant raises the following issues on appeal:

1. Whether or not the trial court erred in dismissing Mrs. Brewer's Petition for Contempt by failing to find Mr. Brewer in contempt of the alimony provisions of the parties' written Property Settlement Agreement as referred to and adopted in the Final Decree of Divorce?

1.a. Whether or not a third party "substantially contributed" to Mrs. Brewer's support, thereby relieving Mr. Brewer of a portion or all of his obligation to pay alimony?

1.b. Whether or not laches and/or waiver should be applied in this case to relieve Mr. Brewer from his failure to pay the agreed upon alimony obligations to Mrs. Brewer?

2. Whether or not the trial court erred in finding that Mr. Brewer's current total

monthly alimony obligation was $200.00 per month?

3. Whether or not the trial court erred in failing to award Mrs. Brewer her attorney's fees and suit expenses that she incurred in the prosecution of this cause?

■ We first consider whether the trial court erred in failing to order Mr. Brewer to pay all alimony arrearages. We note from the outset that there is disagreement between the parties as to whether the property settlement agreement was incorporated into the decree; thus, becoming an order of the court. Ms. Brewer contends that the decree adopted by reference the parties' written property settlement agreement. Mr. Brewer asserts that the decree "approved" portions of the Agreement, but did not explicitly incorporate any of it by reference into the decree. The language of the decree reads:

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:

.   .   .   .   .

3. That the property settlement agreement ... is hereby approved except those portions of said agreement which relate to [Mr. Brewer's] financial responsibilities toward the children of the parties after they reach the age of majority, said provisions being neither approved nor disapproved;

Those provisions of the Agreement specifically referred to by the trial court and set out in the decree include: Mr. Brewer's obligation to pay Ms. Brewer $200 per month as alimony; Mr. Brewer's obligation to pay $300 per month per child as child support and that when the child support for each child is terminated for any reason, the payments are then to be paid to Ms. Brewer as alimony; and Mr. Brewer's agreement to pay Ms. Brewer one-half of any net income increase over his present annual income of $31,500.

Property settlement agreements or stipulations between spouses in divorce proceedings may be incorporated in, and made an operative part of, the decree, so as to effect a merger between the agreements or stipulations and the decree, or they may be merely approved by the court and their

validity established without being given decretal effect, . . . .

.    .    .    .    .

Under some authorities, a property agreement has not been regarded as merged in the judgment or decree so as to have decretal effect in the absence of clear and unequivocal language by the court requiring that conclusion, and such a merger has not been accomplished merely by reference in the decree. Accordingly, if the property rights and obligations of the parties are to rest on the divorce decree, the agreement as to those rights and obligations must be fully and specifically set forth in the decree, in order that the duties imposed on, and the rights granted to, the parties can be ascertained from the decree itself.

Other authorities, however, have held that such an agreement may be incorporated by reference into the decree so as to be given decretal force and effect, or that it may be incorporated by copying it in the decree . . . .

. . . it has been suggested that considerable uncertainty can be avoided by a plain statement on the part of the court as to whether or not a property settlement agreement is merged in a divorce decree.

A property settlement agreement . . . between the spouses in divorce proceedings which is incorporated and merged in the divorce decree becomes a disposition by the court of the property, which is conclusive upon the parties, . . . . As otherwise stated, by its merger into a divorce decree, a property settlement agreement or stipulation loses its contractual nature, and its provisions may be enforced by a court order, . . . .

A property settlement agreement of the parties which the divorce court approves, or which it does not disapprove, and which is not incorporated and merged in the divorce decree remains in effect after the decree, and the property rights of the parties rest on, and are governed by, the agreement and not by the decree. In such case, the agreement may not be enforced as a part of the decree and is not subject to modification by the court, in the absence

of a stipulation by the parties permitting such modification.

A property settlement agreement not merged in a divorce decree may, however, be sued upon in an independent action in contract.

27C C.J.S. *Divorce* §§ 574–76 (1986).

Upon review of the record, we determine that the final decree of divorce explicitly "approved" portions of the parties' Agreement, specifically incorporated "major portions" and failed to expressly incorporate by reference all remaining provisions. The rights and liabilities of the parties are clearly set forth in the provisions specifically included; thus, we find that these were incorporated and merged into the decree.

■ As to those provisions of the agreement not specifically referred to, we find that they did not merge into the decree. There is no clear language by the court incorporating these provisions by reference. In *Flynn v. Flynn*, 42 Cal.2d 55, 265 P.2d 865 (1954), the Supreme Court of California determined that "a document may be incorporated either expressly or by apt reference into a judgment or decree so as to make it an operative part of the order of the court." *Flynn*, 265 P.2d at 867. Under current Tennessee law, the trial court may incorporate by reference property settlement agreements into final decrees of divorce. *See Blackburn v. Blackburn*, 526 S.W.2d 463, 464 (Tenn.1975); *Prim v. Prim*, 754 S.W.2d 609, 610 (Tenn.1988). "Incorporation by reference" is defined in Black's Law Dictionary as follows:

The method of making one document of any kind become a part of another separate document by referring to the former in the latter, and declaring that the former shall be taken and considered as a part of the latter the same as if it were fully set out therein.

*Black's Law Dictionary*, 766–67 (6th ed. 1990). We conclude that the provisions not specifically referred to or set out in the decree were not incorporated by reference as heretofore defined. Thus, these provisions are subject to enforcement by an independent action applying general principles of contract law. This holds equally true for

those provisions neither approved nor disapproved by the trial court.

We now consider whether the trial court erred in failing to find Mr. Brewer in arrears by considering only those provisions expressly approved and incorporated into the final decree. The parties' main point of contention apparently stems from paragraph 3f of the decree which obligates Mr. Brewer to pay Ms. Brewer one-half of any net income increase over his annual income of $31,500. The trial judge found that Ms. Brewer had waived the provisions allegedly breached by Mr. Brewer. The question of waiver is a fact matter to be shown by the evidence. *Koontz v. Fleming*, 17 Tenn.App. 1, 65 S.W.2d 821, 824 (1933). Thus, we presume that the trial court's finding is correct unless the preponderance of the evidence is otherwise. Rule 13(d) T.R.A.P.

Our review of the record reveals the following pertinent facts: Beginning in 1983 through 1991, Mr. Brewer's net income exceeded $31,500. Mr. Brewer concedes that he "[made] more money" than the threshold amount, but did not pay Ms. Brewer any additional alimony. Mr. Brewer testified that in 1986 or 1987, the parties conversed by phone, and that Ms. Brewer asked, "aren't you making more money now?", to which Mr. Brewer replied, "yes, I am, but remember, Sally, I paid you all those years when I made much less."[1] He stated that Ms. Brewer responded, "that's right," and the conversation ended. He testified that the subject was never approached again until 1991 in a meeting with Ms. Brewer which he initiated. The latter conversation was summarized by letter, pursuant to Ms. Brewer's request, as follows:

1. I am suggesting that we try to reach a mutually acceptable agreement between us to amend the terms of our property settlement and divorce decree in such a way that my monthly alimony payments will be reduced and provide a date of final termination.

2. I believe this is just and fair to both of us because:

a. You have been living with another party for a long time who, as you put it, "shares expenses."

b. I have forgiven these circumstances and the rights they afforded me under law for some 7 years in order to ensure financial support for Wes in the years after he reached age 18 years but still lived with you, and in an effort to satisfy my conscience over financial obligations to your father.

c. I have always endeavored, and often struggled, to meet my responsibilities to you and to be more than fair about your needs, beginning with the period 1976 to 1982 when, despite the fact that my personal annual earnings were far below my salary at the time we divorced, I consistently paid you not only the required $800 monthly in alimony and child support but a $22 monthly addition for a furniture contract which has long since been retired. In fact, the sum of what I have paid you since 1976 is in excess of $140,000.

Mr. Brewer testified that he became aware of the "paramour statute" in the 1980s and that he became aware of Ms. Brewer's cohabitation with Mr. McDevitt in approximately 1980.

A follow-up letter, dated March 13, 1991, from Mr. Brewer to Ms. Brewer reads:

From your responses over the last 60 days, I gather that you consider our current terms just and fair and necessary to meet your present needs. Fine. I do not share that view, but I've always stretched my resources to accommodate you and I'm willing to continue to do so. . . .

Your check for $822 will continue to arrive on or about the 15th of every month, and I will raise no further issues about your personal living arrangements.

Ms. Brewer testified that she never received any net income increase over the threshold amount of $31,500 and was not aware that Mr. Brewer's income was over this amount until her attorney obtained his tax returns.

1. Mr. Brewer's testimony reveals that he filed for personal bankruptcy in 1977 when his total income was $17,000. His total income for the years 1978 and 1979 was approximately $20,000 per year. His net income in 1982 was approximately $19,000.

She additionally testified regarding the 1987 phone conversation:

> In 1987, we had a telephone conversation where I asked him about the increase over thirty-one five at this time. He said that he was unable to pay this to me. I didn't know he was making—what increase he was making, and he informed me then that if I chose to take this matter back to court that I would find that women nowadays do not get what they used to.
>
> ....
>
> A. Yes, it was a conversation between us where we were discussing the fact that I wanted an increase over any thirty-one five, and at that time, he was not going to give me an increase and I may have suggested that I was going to take him back to court and he—I remember it specifically because it stuck with me. He intimidated me, and said that women today get nothing like I did when we divorced.

Waiver is a voluntary relinquishment or renunciation of a known right. *Baird v. Fidelity—Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (1942); *Reed v. Washington County Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn.1988). "It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive." *Baird*, 162 S.W.2d at 389. Mr. Brewer asserts that Ms. Brewer waived her right to any additional monies after he informed her in 1987 that "he was making more money" and she took no steps to enforce her alleged rights at this time. The parties' testimonies regarding Ms. Brewer's knowledge or discovery of Mr. Brewer's increase in income is conflicting. In view of the lower court's ruling, we necessarily conclude that Mr. Brewer's account was accorded credibility.

Where the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances. *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315 (Tenn.1987). Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses. *Royal Insurance Co. v. Alliance Insurance Co.*, 690 S.W.2d 541, 543 (Tenn.App.1985).

*Tenn–Tex Prop. v. Brownell–Electro, Inc.*, 778 S.W.2d 423, 425–26 (Tenn.1989). We find that the evidence supports a finding by the trial court that Ms. Brewer waived her right to receive the additional alimony.[2] We also find that Mr. Brewer waived his right to petition the court for any reduction in or termination of the alimony paid Ms. Brewer due to her living arrangements.

We next consider whether the trial court erred in finding that Mr. Brewer's total monthly alimony obligation is $200. The trial court determined that the payment of other additional amounts (in excess of the $200 per month) "was based on contingencies in the parties' agreement which were not approved by the Court at the time of the divorce." The record reveals that those provisions "neither approved nor disapproved" by the court related to Mr. Brewer's financial responsibilities *toward the children* after reaching the age of majority. We find that the provision obligating Mr. Brewer to pay "as alimony" the amount of the payments, previously paid as child support, but terminated for whatever reason, to be a continuing obligation *to Ms. Brewer* and not the children. Therefore, we cannot agree with the reasoning of the trial court on this matter. Its decision to reduce Mr. Brewer's alimony obligation will be upheld, however, despite erroneous reasoning, if the result is correct.

---

2. Counsel for Ms. Brewer conceded at oral argument that Mr. Brewer had complied with the provisions relating to the children. We find that those provisions obligating Mr. Brewer to pay her reasonable medical and dental expenses and to assign one-half his life insurance were also waived.

*See Pearson v. Garrett Fin. Services, Inc.,* 849 S.W.2d 776, 780 (Tenn.App.1992).

A court may order an increase or decrease in alimony payments "only upon a showing of a substantial and material change of circumstances." T.C.A. § 36–5–101(a)(1). Modification is authorized only if the alimony awarded is periodic alimony, as opposed to alimony *in solido.* In *Spalding v. Spalding,* 597 S.W.2d 739 (Tenn.App.1980), this Court cited with approval the following language from 24 Am.Jur.2d *Divorce and Separation* § 614 (1966):

> Alimony in gross, or "lump-sum alimony," is fundamentally the award of a definite sum of money; and if the sum is payable in instalments [sic] the payments run for a definite length of time. The sum is payable in full, regardless of future events such as the death of the husband or the remarriage of the wife.

*Spalding,* 597 S.W.2d at 741. *See also McKee v. McKee,* 655 S.W.2d 164, 165 (Tenn. App.1983) (most distinguishing factor of alimony *in futuro* is indefiniteness of amount ordered to be paid).

In the instant case, the alimony payments of $200 per month are to cease upon the death of either Mr. or Ms. Brewer or upon the remarriage of Ms. Brewer. The additional $600 per month was to be paid as alimony to Ms. Brewer when the child support terminated for any reason. The record reveals that both children have reached the age of majority and that Mr. Brewer has continued to pay $600 to Ms. Brewer as alimony. The indefiniteness of this amount is quite clear as neither the trial court, nor the parties by agreement, limited or specified a total amount to be paid. Thus, we find that the alimony awarded is alimony *in futuro* and subject to modification by the trial court.

We next determine whether the evidence supports a finding of a substantial and material change in circumstances warranting a reduction in the amount of alimony awarded. This change in circumstances must have occurred since the original award. *Jones v. Jones,* 659 S.W.2d 23, 24 (Tenn.App.1983). Ms. Brewer's testimony clearly establishes that she and McDevitt lived together from 1979 until December 1991. At the time of the hearing, McDevitt resided in Florida. Ms. Brewer's father died in 1983 and she inherited approximately $110,000. She testified that she used her inheritance money to purchase residential property which was eventually sold for a profit. She stated that McDevitt and Terry Lynch were in the business of brokering mortgages and that she began working in the business, known as Invest Co., in 1984. She became an investor and bought and sold four to five pieces of property. She valued her real estate investments on a financial statement completed in October 1990 at $47,000.

At the hearing in April 1992, she testified that she owned one piece of rental property and the residence in which she lived. She purchased the rental property in October 1991 through foreclosure proceedings. This property, appraised at $42,900, is unencumbered and she receives rental income of $450 per month. According to Ms. Brewer, her investments were financed as follows: "[E]very time I borrowed my own inheritance money to invest in property ... I would invest in one property and then get that paid off and then take monies that I received from that property to reinvest into other properties." From the evidence presented, it appears that since the alimony award, Ms. Brewer has inherited funds which she has used to invest in properties from which she has profited.

At the 1992 hearing, she referred to the 1990 financial statement which values her present home at $82,000 and lists her total outstanding debts at $32,197 as follows:

> A  I believe I had a piece of real estate property at that time, which has been disbursed, and now I have another property that's worth less than that now. I have less certificates of deposits now. I guess the only increase on this was I had added more insurance to it and I had added, I believe, household furnishings or the furs, jewelry and silver which were inherited.

Ms. Brewer listed the value of her total household furnishings in the financial state-

ment at $15,000. Her furs, jewelry, silver and china were valued at $15,000 and her C.D.s at $20,000.[3] Her total assets were listed at $325,000 less a $135,000 life insurance policy. Her net annual salary was listed at $15,000.

Ms. Brewer, 57 years old at the time of the hearing, testified that she is skilled in "light secretarial and receptionist" work. She has not worked since the latter part of 1990. Her health problems are high cholesterol, arthritis and poor eye sight.

Mr. Brewer testified that he is a communications consultant and that his annual income in 1992 was $60,000. He and his present wife reside in a condominium valued at $110,000. There is a mortgage on this property. He stated that the deed to this property lists as owners his wife and mother-in-law. He and his wife also have stock in First Tennessee Bank which totaled $63,500 in 1991. He further testified that his only access to any other funds was his IRA valued at approximately $36,000. On a 1991 financial statement to First Tennessee Bank, he and his wife's total assets were listed at $220,200 and their liabilities totaled $89,700.

■ The factors listed in T.C.A. § 36–5–101 applicable to the initial award of alimony, where relevant, must be taken into consideration when determining whether there has been a change in circumstances warranting a modification of the award. *Norvell v. Norvell*, 805 S.W.2d 772, 774 (Tenn.App.1990). Applying the statutory factors, where relevant, to the instant case, we conclude that the trial court's reduction of the alimony award was proper.

T.C.A. § 36–5–103(c) authorizes a recovery of reasonable attorney fees incurred in enforcing a decree for alimony at the discretion of the trial court. After reviewing the record, we find no abuse of discretion by the trial court in failing to award Ms. Brewer her attorney's fees.

**3.** These C.D.s were used as collateral to purchase a piece of property in 1986. She stated that she used her inheritance money to invest in the prop-

The judgment of the trial court is affirmed and costs are taxed to Appellant, for which execution may issue if necessary.

TOMLIN, P.J. (W.S.), and HIGHERS, J., concur.

erty. Thus, we necessarily assume that the C.D.s were purchased with inheritance money.