# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 25, 2012 Session

## DIANE S. HAND v. GOLDEN E. HAND, SR.

**Appeal from the Circuit Court for Davidson County**
**No. 01D2746      Phillip E. Smith, Judge**

---

**No. M2010-02404-COA-R3-CV - Filed July 31, 2012**

---

The parties married twice and divorced twice. Under the terms of their second divorce decree, the wife was awarded the marital home, the husband and wife were made jointly responsible for the mortgage on the home, and the husband was ordered to pay the wife alimony in futuro of $1,200 per month. About five years after their second divorce became final, the husband filed a petition to terminate or to modify his alimony obligation. He alleged among other things that his income had declined and that his wife no longer needed his support, as demonstrated by her conveyance of the marital home without consideration to the party's son, and her relationship with her new boyfriend. For her part, the wife petitioned the trial court to increase the husband's alimony obligation, alleging that her need had actually increased because her physical ailments had worsened and that the monthly cost of medications to treat them had soared. The trial court denied both petitions. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Sandra F. Jones, Jon Steven Jablonski, Nashville, Tennessee, for the appellant, Golden E. Hand, Sr.

David Scott Parsley, Michael K. Parsley, Nashville, Tennessee, for the appellee, Diane S. Hand.

## OPINION

### I. MARRIAGE, DIVORCE AND ALIMONY

The first marriage of Golden Hand, Sr. (Husband) and Diane Hand (Wife) ended in divorce around the year 1990. The trial court ordered the division of the marital property in accordance with the terms of the parties' Marital Dissolution Agreement. Husband was awarded his business, Nashville Hydraulics, free and clear of any claim by Wife, and the commercial building at 711 51st Avenue North in which he conducted his business. He was also ordered to pay Wife the sum of $13,000 as property division.[1]

Seven months after their divorce, Husband and Wife remarried. Their quick remarriage occurred before the division of marital assets ordered in the divorce decree could be fully completed. The parties' second marriage to each other lasted about fourteen years. Wife filed a complaint for divorce in the Circuit Court of Davidson County, accusing Husband of misconduct. Husband answered and counter-claimed for divorce, alleging that Wife was herself guilty of misconduct. The court conducted a divorce hearing on April 28, 2004. In the final decree of divorce, filed on May 17, 2004, the court found that both parties had acted inappropriately, and it declared them divorced pursuant to Tenn. Code Ann. § 36-4-129.

Under the terms of the final decree of divorce, the parties were ordered to complete the division of property in accordance with the provisions of the first divorce decree. Additionally, a joint savings account containing about $75,000 was divided equally between the parties. Husband was also ordered to pay Wife alimony of $1,200 per month "until her death or remarriage or his death or further orders of the court," and to provide her with medical insurance for eighteen months. To secure his obligations, Husband was ordered to maintain a life insurance policy in the amount of $100,000 that named Wife as beneficiary and to keep the policy in effect as long as he had an alimony obligation.

The marital home was awarded to Wife. The parties were each made responsible for payment of one half of the remaining mortgage debt on the marital home, in the amount of about $500 per month each. To protect the value of Wife's interest in the marital home, the trial court ordered that Husband's obligation to pay his share of the monthly mortgage amount would continue even if Wife sold the house and liquidated the mortgage debt.

---

[1]The parties were first divorced in the probate court of Davidson County. Their decree of divorce and MDA from those proceedings are not found in the appellate record. The facts we have recited about the content of those documents were discussed by the Circuit Court during the current proceedings leading to the second decree of divorce.

## II. PETITIONS TO MODIFY ALIMONY

Husband filed a petition on March 3, 2009 to terminate or reduce his alimony obligation. He alleged that "an unforeseeable material and substantial change of circumstances has occurred since the entry of the Final Decree in this case," justifying a reduction in his obligation. The alleged changes were (1) that his ability to pay alimony had declined because of the national economic turndown and (2) that Wife was living with her boyfriend and that his support of her showed that she no longer had any need of alimony. Husband also stated that Wife had conveyed the marital home to the parties' son, Golden Hand, Jr., without consideration, and that Husband should therefore be relieved of his obligation to pay one-half of the mortgage amount.

Wife filed an answer on April 7, 2009. She denied that she was living with her boyfriend. She admitted that she had conveyed the marital home to the parties' son, but she asserted that there was consideration for the conveyance in the form of his liquidation of the mortgage and her retention of a life estate in the property. She also testified that she moved into an 800 square foot "pool house" on the marital property after her son and his family moved into the marital home.[2]

Wife thereafter filed a petition for criminal contempt against Husband on May 19, 2009. She alleged that in the same month that Husband filed his petition, he had stopped paying both his alimony and his obligations on the mortgage debt and that he had allowed his life insurance policy to lapse. Wife's petition also contained a prayer for an increase in alimony. She alleged that her physical ailments had worsened, that the monthly cost of medications to treat them had soared, and that she could not obtain medical insurance.

The court conducted five days of hearings on the competing petitions, beginning on October 29, 2009, and ending on August 18, 2010. Both parties testified extensively. Additional testimony was received from two private investigators that Husband had retained to follow Wife, one of Husband's office employees, and two accountants who prepared tax returns for Husband's business. At the conclusion of testimony, the trial court took the case under advisement.

The trial court's determinations were contained in a memorandum and order on Wife's petition for contempt, and a memorandum and order on all other matters at issue. Both documents were filed on October 12, 2010. The court found that Husband's testimony as to his financial condition and that of his company, a sole-proprietorship, was not credible. The

---

[2]Husband testified that the parties had removed an in-ground pool on the property and had built a small cottage in its place.

court also found that Wife was a credible witness, that Husband had failed to carry his burden of proving that Wife was living with her boyfriend, and that Wife still needed the alimony that had been ordered. The court accordingly denied Husband's petition to have his alimony obligation terminated or reduced.

The court also held that Wife's conveyance of the marital home to her son was equivalent to a sale under the terms of the final decree, and thus that Husband's obligation to continue paying his half of the mortgage indebtedness was still in effect. Additionally, the court denied Wife's request for an increase in alimony, finding that the increase in her need was not material because it was foreseeable, and that in any case Husband did not have the ability to pay more.

The court also found Husband to be in criminal contempt, for failing to pay court-ordered alimony payments on seven separate occasions. Husband was sentenced to 70 days in jail, but the sentence was suspended on condition that Husband pay the alimony he owed. The court also ordered Husband to pay Wife's attorney fees in the amount of $10,000 because she did not have the ability to pay. This appeal followed.

## III. THE QUESTION OF ALIMONY

### A. The Standard of Review

We review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). Further, when the trial court has seen and heard witnesses and has had the opportunity to observe their demeanor, it is in the best position to assess their credibility, and thus we must accord considerable deference to factual findings made by the trial court on the basis of its credibility determinations. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999); *Powell v. Powell,* 124 S.W.3d 100, 104-105 (Tenn. Ct. App. 2003); *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001). In contrast, we review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

In order to modify an alimony award, the person requesting the modification must prove that a substantial and material change of circumstances has occurred since the original award was entered. Tenn. Code Ann. § 36-5-121(a); *Freeman v. Freeman,* 147 S.W.3d 234, 230 (Tenn. Ct. App. 2003). Once a substantial and material change of circumstances has been established, the party seeking modification must demonstrate that a modification is

warranted. *Bogan v. Bogan,* 60 S.W.3d at 730; *Brewer v. Brewer*, 869 S.W.2d 928, 935 (Tenn. Ct. App. 1993). To determine the appropriate amount of modification, if any, the trial court should consider those factors set out in Tenn. Code Ann. § 36-5-121(i) that are relevant to the matter at hand. The two most important factors to consider in modifying an alimony award, however, are the financial ability of the obligor to provide support and the financial need of the party receiving the support, with those two factors being given equal consideration. *Bogan v. Bogan,* 60 S.W.3d at 730.

Husband argues on appeal that contrary to the trial court's determination, he no longer has the ability to pay as much alimony as had been ordered, because of the declining fortunes of his business. He also contends that Wife no longer has any need of alimony. These are questions of fact, so we must presume the court's findings on those matters to be correct, unless the evidence preponderates otherwise.

## B. Husband's Ability to Pay Alimony

The proof showed that Husband is the owner and sole shareholder of Nashville Hydraulics, Inc., a small business that repairs and services hydraulic equipment. He has operated the business for over thirty years, and most of his clients are small contractors. Husband characterizes the business as a mom and pop operation. A handful of employees, including Husband's brother, work for him. Nashville Hydraulics is Husband's primary source of income. He also receives a disability pension of $240 per month from the Veterans Administration for injuries he suffered in Vietnam. He deposits his pension checks in a separate savings account that he tries not to touch.

Husband testified that his business is not doing well because of the state of the economy. Among other things, he testified that in 2002 the company paid him a salary amounting to $17 an hour, but that at some point he decided to take a pay cut to $10 an hour because of poor economic conditions. He stated that the pay cut made him the lowest paid employee of the company. Asked why he did not cut the salary of other employees or lay them off, he explained that some of them had been with him for a long time and that they had families and children to support. Husband also testified that he had to work 12 to 14 hours a day to keep the business running and that he very rarely takes a vacation.

The record is replete with evidence that brings Husband's narrative of economic hardship into question. Said evidence includes Nashville Hydraulics' corporate income tax returns from 2004 to 2008, Husband's personal income tax returns from the same years, monthly statements on company credit cards, husband's own testimony, and testimony from three of the company's bookkeepers. We do not believe it necessary to describe in detail the substance of all this evidence, but we will at least point out some of the reasons the trial court

did not regard Husband's account of his financial condition as completely accurate.

Husband acknowledges that aside from his salary, he receives an additional $300 each week as rent for his personally-owned company building on 51st Avenue North. He testified, however, that at the beginning of 2009, he instructed his office manager to stop paying him rent in order to preserve company funds. When confronted by deposit slips which indicated that the rental payments continued to be deposited into his personal savings account until May of 2009, he explained that the office manager must not have understood his instructions. The proof also showed that Husband's bookkeeper writes him a check for cash every week, in amounts varying from $200 to $1,000. Husband testified that he uses that cash to pay employees who come in to work on Saturday, and for parts and materials. He does not give the bookkeeper receipts for any parts or materials that he buys, so it is impossible to account for all the cash he receives.

Husband's personal finances and the finances of Nashville Hydraulics are so intermingled that even his bookkeepers cannot always distinguish them from each other. For example, Husband does not carry any personal credit cards, but uses two business credit cards for all purposes. Thus, the same credit card statement that includes charges from obvious industrial vendors such as Florig Equipment Company of Conshohocken, Pennsylvania, and Spencer Fluid Power of Kent, Washington, might also include charges for groceries, numerous restaurant meals, tickets for comedy clubs, outings at adult entertainment clubs, and even a vacation for six on Carnival cruise lines.

Under cross-examination, Husband characterized many of the grocery and restaurant entries as business-related. He explained that he kept a stocked pantry on the business premises for employees and for clients who sometimes had to wait on the premises for work to be finished. He also stated that he frequently took vendors and customers out to eat. Husband acknowledged that he used a company credit card to book the Carnival cruise for employees and friends in 2009, after he filed his petition for termination of alimony, but he stated that his fellow vacationers ultimately paid him back for their shares of the cruise expenses. Another entry from that same period shows a $435 charge from Morton's steakhouse, which included a $100 tip. A earlier statement included a $140 charge for a monkey costume that Husband rented for the birthday of the bookkeeper's son.

Husband admitted that some of the charges on the company credit cards were for personal expenses. These included a $276 charge to pay a cell phone bill for a 27 year old exotic dancer he had befriended, two nights at a hotel adjacent to Casino Aztar in Evansville, Indiana where he saw that same friend, and a wool coat that he purchased for her during that

same outing. He also used the credit card to rent a U-Haul truck or trailer rental for another young lady friend who wanted to move from Missouri back to Nashville. The purpose of this recitation is not to criticize how Husband chooses to spend his money, but to point out that he somehow was able to buy gifts and provide expensive entertainments for employees and friends, while insisting that he could no longer afford to pay his court-ordered alimony.

Husband was unable to explain, or even to remember, the nature or purpose of some other large charges on the company credit cards. For example, his Visa card showed a charge of $475 to the Knights of the Golden Circle in December of 2008, and three subsequent charges of more than $150 to the same organization. Asked about those charges, he repeatedly testified that he did not know anything at all about them or about the group that received them. He finally acknowledged that they probably involved his brother, who he sometimes allowed to use the card. The proof also showed that on occasions he let the company bookkeeper use a company card for items like lingerie and perfume.

Payment of company expenses, including payments to Visa and American Express, are made through checks drawn on a primary company account.[3] The business has a second checking account into which funds are deposited that are received from customers that pay for services with a credit card. Husband testified that sometimes there is not enough money in the primary company account to make payroll or pay other expenses. When that occurs, he transfers money from the credit card account or from his personal credit union account to make up the difference.

Husband deems transfers from his personal account to the company account to be a loan from himself to the company, and he rationalizes his use of company funds for personal purposes as partial repayment of those loans. The record does not contain any notes or other documentation identifying those loans or their repayment. The lack of adequate documentation as to those purported transactions makes it difficult to understand Husband's true financial situation. We note, however, that Husband has managed to maintain a remarkably constant balance of about $30,000 in his credit union account since the divorce.

The corporate income tax returns in the record do not show a pattern of decline in the volume of business at Nashville Hydraulics. In 2004, gross sales amounted to $644,872. In 2005, the figure was $697,980. In 2006, it was $791,039, in 2007 it was $820,260, and in 2008 it was $791,290. The corporate returns did not show taxable corporate income in any of those years, but rather a loss in each one. We do see a reduction in Husband's personal income over those years, as reported on his personal income tax returns.

---

[3]Husband even used checks drawn on his business account to pay his attorney for her services related to the petition to reduce alimony, until she warned him that it was not appropriate.

In a case involving child support, our Supreme Court recognized the potential for manipulation of income available to a majority shareholder in a corporation or a sole proprietor who wishes to avoid an obligation based on the amount of that income. *Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005). After considering all the evidence, we find that it does not preponderate against the trial court's conclusion that Husband remains capable of paying his alimony obligation as ordered.

### C. The "Live-in Lover" Statute

The trial court's 2004 divorce decree stated that Wife admitted she was involved in a relationship with a man who was not her husband, but that she denied being in a sexual relationship with him and that there was insufficient proof that she was guilty of adultery. During the current proceedings, Wife admitted that she had entered into a sexual relationship with the same man, a Mr. Sullivan, and that they regularly spent time together. Husband attempted to prove that they were living together, so he could receive the benefit of the so called "live-in lover" provision of the alimony statutes, which reads as follows:

> In all cases where a person is receiving alimony in futuro and the alimony recipient lives with a third person, a rebuttable presumption is raised that:
> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should suspend all or part of the alimony obligation of the former spouse; or
> (ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should suspend all or part of the alimony obligation of the former spouse.

Tenn. Code Ann. § 36-5-121(f)(2)(B).

The above statute does not mean that alimony is automatically terminated upon proof that the recipient is living with a third person, but it rather creates a presumption that the full amount of alimony is no longer needed, and it shifts to the recipient the burden of rebutting that presumption by proving that his or her needs remain unchanged. *Isbell v. Isbell,* 816 S.W.2d 735, 738 (Tenn. 1991); *Azbill v. Azbill*, 661 S.W.2d 682, 686 (Tenn. Ct. App. 1983).

The trial court specifically found in this case that Wife was not living with Mr. Sullivan and, thus, that the presumption did not even arise. Husband argues on appeal that the trial court's finding was erroneous. He relies on a single sentence found in the court's

final order as a major pillar of his argument. However, that sentence contradicts the court's own finding, does not accurately reflect the evidence that was heard, and is clearly a misstatement. Before discussing that error, we will briefly summarize the relevant testimony in the record.

The proof showed that Wife maintains her own residence in a cottage located on the former marital property that is now owned by her son and that she pays her son $400 per month in rent. Mr. Sullivan lives in a condominium less than a mile away. Husband retained a licensed private investigator, who conducted seven days of surveillance on Wife in the summer of 2008. He testified that he observed Mr. Sullivan's vehicle parked overnight at Wife's residence on some nights and Wife's vehicle parked overnight at Mr. Sullivan's residence on some nights.

Wife testified that she pays the expenses of maintaining her own home, while Mr. Sullivan maintains his. She denied that he contributes to her support, but acknowledged that if Mr. Sullivan invites her out to eat, he pays for her meals. She also acknowledged that he is welcome in the homes of most of the members of her extended family. Wife was asked how many nights a week on average she actually spent at Mr. Sullivan's residence, and she answered "no more than two." She was then asked how many nights he spent at her house:

Q. For the past three months, how many nights, on average, has he spent?

A. I'd say five.

Q. Okay.

A.. Mainly it's a Saturday night if he stays.

Wife acknowledged that she and Mr. Sullivan had owned a motor home together, but that after Husband filed his petition, her name was removed from the title. During the summer, the motor home is parked on a rented lot near the Tennessee River. Mr. Sullivan pays for the rental. Wife testified that the motor home was available to her from May to November, and she acknowledged at deposition that she "pretty much spent the entire summer there." But when she was asked at trial "how many months" she stays in the motor home during the summers, she responded, "[i]t's hard to know, you know. I stay with the grand babies a week or two. I stayed two weeks. I may have stayed three."

In the final order, the trial court explained that under Tenn. Code Ann. §36-5-121(f)(2)(B), Husband had the initial burden of establishing that Wife was living with a third person. The court then summarized her testimony, including that she and Mr. Sullivan

each maintain their own homes and that they do not contribute to each other financially. The court stated that after observing Wife's demeanor and listening to her testimony, it found her to be "very believable and creditable." The court concluded that Husband had failed to establish his statutory burden, and it denied his request to modify the alimony in futuro based on the allegation that Wife is residing with a third party.

The court's summary of the evidence included the following paragraph:

Ms. Hand readily admits that she stays at the alleged male individual's home on occasion. She admits that the average number of nights that she has spent there is two times per week. Ms. Hand testified that this gentleman sometimes spends the night at her home. Actually, for the last three months he has stayed at her home an average of five nights per weeks (sic). She stated that he has stayed there more recently because of her health.

Husband argues on appeal that the trial court's conclusion is contradicted by the evidence. He argues that Wife spent "pretty much the entire summer" in the motor home, rent free, that Mr. Sullivan is considered part of her extended family, and that "two nights per week at his house and five nights per week at her house appears to be full-time living together."

Husband's argument overlooks Wife's testimony that measures her time in the motor home during the summer in weeks rather than months, and the $400 per month rent that she apparently pays on her cottage whether she is there or not. Wife did not testify that Mr. Sullivan is considered part of her extended family, but only that he is welcome at most family events. Finally, we have carefully examined the questions as to how frequently Mr. Sullivan spends the night at Wife's home, and her testimony in response.

Husband's attorney asked Wife how many nights Mr. Sullivan spent at her house, on average, over the last three months. There is no indication in Wife's answer of five that she was referring to a weekly average. Rather, the response "mainly it's a Saturday night if he stays," suggests that she was looking at a monthly average. Thus the trial court's reference to "five nights per weeks" in a single sentence appears to us to be a drafting error. The evidence does not preponderate against the trial court's conclusion that Wife is not living with Mr. Sullivan, and thus that Husband is not entitled to the statutory presumption that Wife no longer needs alimony.

**D. Wife's Need for Alimony**

Husband argues that even without the benefit of the "live-in-lover" presumption, the

proof shows that Wife no longer needs the alimony he has been ordered to pay. He bases his argument on the steps she has taken to reorganize her life and reduce her financial burden. It is undisputed that after her son paid off the mortgage, Wife divested herself of the marital home by conveying it to him. Husband contends that if she can afford to surrender a property that the proof showed to have a value of between $189,000 and $200,000 "for no consideration," she no longer has any need for alimony.

Wife testified, however, that she was unemployed when she conveyed the property, that the marital home was in danger of foreclosure, and that by having the mortgage paid off and retaining a life estate, she avoided foreclosure, while guaranteeing herself a place to live for the rest of her life. As we noted above, Wife pays $400 per month in rent to her son. Husband argues that since Wife retains a life estate in the property, she is under no legal duty to pay rent and that the unnecessary expenditure is another reason that she does not need alimony. He also insists that her willingness to babysit for her grandchildren without compensation further demonstrates her lack of need. It appears to us, however, that Wife has made reasonable and necessary accommodations with her son and his family to enable three generations of the same family to live together for everyone's mutual benefit, but that she has not thereby eliminated her need for alimony.

Wife testified that the rent she pays goes primarily for utility expenses, like electricity, gas, water and phone. Further, her income and expense statement shows that she faces additional expenses, such as of $400 for food, $386 for repayment on credit cards, and $229 for car operation. But Wife's largest expenses by far are for her medical needs. She testified that although she was working at the time of the divorce, she has since become disabled and can no longer work.

She explained that she suffers from type 1 diabetes and from blockages in her cardiac arteries, that she needs a knee replacement, and that she takes 22 pills and two injections a day. She testified that the prescription drugs she takes for her medical conditions cost about $1200 a month. A printed document from Plaza Pharmacy that was entered into the record lists all her prescriptions with the dosage and price for each item, and confirms the cost.

Wife stated that she has paid for her prescriptions through borrowing from friends and family members, by using credit cards, and with the assistance of a charity organization called Dispensary of Hope. She testified that does not have health insurance, and that although she has attempted to obtain insurance (including Tenncare) she did not succeed because she is uninsurable. Husband did not present any countervailing evidence as to Wife's medical condition or her expenses.

It is apparent from the record that in the absence of any other income, Wife is still

very much in need of alimony and that rather than negate that need, the actions she has taken in regard to the marital home were an attempt to navigate a difficult situation without putting herself deeper in debt. In sum, the evidence does not preponderate against the trial court findings, and we accordingly affirm its dismissal of Husband's petition to terminate or reduce his alimony obligation.

## IV. THE MORTGAGE OBLIGATION

Husband also argues that under the terms of the divorce decree, Wife's conveyance of the marital home to the parties's son should relieve him of any obligation to continue making monthly mortgage payments. The proper interpretation of a judgment is a question of law and not of fact. *Konvalinka v. Chattanooga-Hamilton County Hospital Authority*, 249 S.W.3d 346, 356 (Tenn. 2008); *Pruitt v. Pruitt,* 293 S.W.3d 537, 544-45 (Tenn. Ct. App. 2008); *Hastings v. Hastings*, 01-A-019603-CH-00128, 1996 WL 33480501 (Tenn. Ct. App. Nov. 27, 1996). Accordingly, our review of that matter is *de novo* with no presumption of correctness accorded to the decisions of the court below. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d at 357.

Judgments are to be construed like other written instruments, and the determinative factor is the intention of the court as gathered from all parts of the judgment. *Stidham v. Fickle Heirs*, 643 S.W.2d 324, 328 (Tenn. 1982). The construction that should be given to a judgment is one that "will give force and effect to every word of it, if possible, and make its several parts consistent, effective and reasonable.*" Blue Cross-Blue Shield of Tennessee v. Eddins*, 516 S.W.2d 76, 78 (Tenn. 1974); *Branch v. Branch*, 249 S.W.2d 581, 582-83 (Tenn. Ct. App. 1952).

Husband's obligations on the marital home's mortgage indebtedness are set out in four paragraphs of the trial court's final decree of divorce as follows:

20. The Court further finds and orders as a division of debt that Husband shall pay to Wife one-half the mortgage note each month, his one half being in the approximate amount of $500.00 or slightly less per month. The Court is considering that this note balance may increase or decrease as a result of other matters. However, Husband is ordered to continue to pay Wife one-half of the same. Wife is ORDERED not to refinance the indebtedness as relates to the marital residence unless the parties agree to some different financing as relates to the marital residence.

21. The Court further ORDERS in any event that one-half of the mortgage payment in the present amount of approximately $500.00 per month

shall be paid to Wife by Husband each and every month, beginning May 1, 2004, along with the previously set alimony payments.

22.   It is ORDERED that in the event Wife desires to sell the marital residence or remarries or decides not to live in the marital residence, that after the marital residence is sold, it is ordered that Husband shall continue to pay Wife one-half of the debt that is owing on this residence as of the date that she vacates.  The Court orders this so that Wife shall be made whole on the mortgage debt after the same is sold.

23.   It is the intent of this Court's Order that in the event that the house is sold and the debt paid as a result of the sale, that the pay off of the mortgage will not relieve Husband, Golden E. Hand, Sr. of his one-half responsibility of the debt owing thereon at the time of sale, i.e., in the event that Wife were to sell the property and the indebtedness still owing at the time is $20,000.00 then Husband is ORDERED to continue to pay Wife as the division of marital debt $500.00 per month until his one-half, i.e. $10,000.00 indebtedness is liquidated.

In paragraph 20, the trial court characterizes Husband's obligation on the mortgage as a division of marital debt.  Such obligations normally end when the debt is liquidated.  Yet paragraphs 22 and 23 clearly indicate that the trial court did not intend Wife's liquidation of the debt to extinguish Husband's obligation to continue paying his one-half of the amount of the mortgage.

Husband admitted at oral argument, that, had Wife sold the house to an unrelated third party and paid off the mortgage balance from the proceeds of the sale, there would be no question that he would remain liable under paragraph 23 to continue making monthly mortgage payments until his total payments equaled one half of the liquidated mortgage.  He argues, rather, that his obligation to keep paying after the mortgage was liquidated was contingent on a sale of the property, and he insists that Wife's conveyance to Golden Hand Jr. did not meet the definition of a sale, in part because no consideration was paid for the property.

Husband points to the unusual terms and timing of the conveyance to bolster his theory.  In November of 2007, Wife's son gave her the money to pay off the mortgage balance of about $60,000.  Wife continued to live in the home after the mortgage was paid.  Six or seven months later, her son returned from military service out of state.  He, his wife and their two children then moved into the home while Wife moved into the cottage on the property.  On May 28, 2008, Wife executed a quitclaim deed.  Husband asserts that a deed

is usually executed at the same time that consideration is paid. He also points out that the home was worth far more than $60,000. He accordingly argues that we should consider the payment of the mortgage and the conveyance of the property as two unrelated acts.

The deed recited, however, that Wife had "bargained and sold" the subject property to her son and daughter in law, and reserved a life estate in the property for herself. The deed acknowledged consideration of "One Dollar ($1.00) cash in hand and other good and valuable consideration," that was paid by grantees. It is thus apparent to us that the parties considered the conveyance to be a sale and that payment of the mortgage and Wife's retention of a life estate were the "good and valuable consideration" that the deed refers to.

Husband also points out that paragraph 22 states that " Husband shall continue to pay Wife one-half of the debt that is owing on this residence as of the date that she vacates." He argues that Wife never vacated the property because she moved into the cottage in back, and he insists that this circumstance negates his obligation. But in light of the entirety of mortgage provisions in the divorce decree and the situation herein, we find Husband's argument unavailing.

Finally, Husband argues that because the mortgage debt has been liquidated and Wife has acquired adequate housing without any further outlay of money, she has, as suggested in paragraph 22 been "made whole," and thus that the intention of the trial court has been fully satisfied. He further insists that if he has to keep making mortgage payments, Wife will be unjustly enriched. As Wife points out, however, the primary question before the court is not whether she has been "made whole" but whether Husband has paid his share of the mortgage debt as paragraphs 20-23 of the Final Decree of Divorce require him to do. It appears to us that he has not yet paid his full obligation. We accordingly affirm the trial court and remand this case for a calculation of the remaining obligation.

## V. ATTORNEY FEES

The trial court ordered Husband to pay the attorney fees Wife incurred defending against his petition to terminate alimony, in the amount of $10,000. Husband argues on appeal that this was error. As a general matter, litigants are expected to be responsible for their own attorneys' fees in the absence of a statute or contractual provision otherwise. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998).

However, Tenn. Code Ann. § 36-5-103 (c) gives the trial court the discretion to award reasonable attorney fees to the prevailing party in cases involving enforcement of any decree involving alimony, child support, or child custody. An award of attorney's fees to an economically disadvantaged spouse is usually characterized as alimony in solido. *Yount v.*

-14-

*Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). Thus, a trial court considering such a request for attorney's fees must consider the factors than normally apply to alimony awards. See Tenn. Code Ann. § 36-5-121(i).

The most important factors are the need of the economically disadvantaged spouse and the ability of the obligor spouse to pay. *Bogan v. Bogan*, 60 S.W.3d at 729; *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). Wife testified that she has been unable to pay anything on the attorney fees she has incurred in defense against Husband's petition to terminate her alimony. There is no evidence in the record to the contrary. Husband may have found it difficult at times to pay all his personal expenses as well as his alimony obligations from the proceeds of his small business. Nonetheless, he does have business income, and Wife incurred her attorney expenses as a direct result of his petition to terminate her alimony.

The decision to award attorney fees in a support proceeding is deemed to be within the sound discretion of the trial court, and will not be disturbed on appeal except upon a clear showing of abuse of that discretion. *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995); *Storey v. Storey*, 835 S.W.2d 593 (Tenn. Ct. App. 1993). We do not believe the trial court abused its discretion under the circumstances of this case, and we accordingly affirm its award of attorney fees.

Wife also asks us to award her the attorney fees she has incurred on appeal. The award of such fees lies within the discretion of this court. *Seaton v. Seaton*, 516 S.W.2d 91, 93 (Tenn. 1974); *Folk v. Folk*, 357 S.W.2d 828, 828 (Tenn. 1962). After carefully considering the equities of the situation, we decline to make such an award.

## VI.

The judgment of the trial court is affirmed. We remand this case to the Circuit Court of Davidson County for any further proceedings necessary, including a calculation of Husband's remaining obligation on the mortgage debt. Tax the costs on appeal to the appellant, Golden Hand, Sr.

_____
PATRICIA J. COTTRELL, JUDGE